UNITED STATES DISTRICT COURT     SOUTHERN DISTRICT OF TEXAS

Sony Discos, Inc., *et al.*,　　　　　　§
　　　　　　　　　　　　　　　　§
　　　　　　　Plaintiffs,　　　　　§
　　　　　　　　　　　　　　　　§
　　　　　　　　　　　　　　　　§　　　　　Civil Action H-02-3729
*versus*　　　　　　　　　　　　§
　　　　　　　　　　　　　　　　§
E.J.C. Family Partnership, *et al.*,　　§
　　　　　　　　　　　　　　　　§
　　　　　　　Defendants.　　　　§

## Opinion on Summary Judgment

1.　　*Introduction.*

　　　　Music producers want to hold the owner of a flea market responsible for unauthorized sales of copyrighted works by vendors at his site. The owner has moved for summary judgment and will prevail.

2.　　*Background.*

　　　　Elwin J. Cole operates a flea market through his companies E.J.C. Family Partnership, Ltd., and E.J.C. Enterprises, Inc. – collectively, Cole. Each weekend, Cole licenses booths to hundreds of vendors. Cole rents the booths to vendors on a first come, first served basis and takes reservations on the preceding Friday. He offers secondary services like food and security to attract vendors and buyers. He collects revenue from booth-license fees, parking, admission, and food sales.

　　　　The vendors offer items ranging from furniture and car parts to clothing and music. Cole gathers the vendors' contact information and tax identification before licensing them a space. His license prohibits the sale of illegal, unsafe, and unlicensed products. He also limits the number of vendors selling a class of merchandise. He may remove vendors who do not comply.

　　　　In April 1998, investigators – representing seventeen producers, including Sony Discos, Inc., collectively Sony – observed vendors selling counterfeit cassettes and compact discs at Cole's market. Between spring 2000 and summer 2002, Sony wrote Cole six letters asking that

he impede infringers and offered to train him, which Cole declined.  In July 2001, the local police department arrested twelve vendors and seized 2,200 cassette tapes and compact discs.

3.      *Infringement.*

Sony sued under theories of contributory and vicarious infringement.  Each requires an underlying direct infringement; that is, (a) the producers must own the copyright and (b) the vendors must have copied the producers' work.  17 U.S.C. § 501 (2002); *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 433 (2001).  Cole has conceded the ownership and validity of the copyrights and that infringing copies were sold by vendors at his market.

Contributory and vicarious infringement are judge-made doctrines that expand the copyright act far past the language of the statute.  They should not be recognized.  If Congress had wanted to include these theories, it would have codified them.  Its silence is not an invitation for courts to tort-ify what is essentially a violation of a property right.  Instead of a malleable negligence standard, those who aid an infringement should be held to the standard used in determining accomplice liability.  Cole would have to be a partner with the wrongdoer, not just someone whose mere existence facilitates the act of infringement.

4.      *Contributory.*

 Even if contributory infringement is a valid cause of action, it should be evaluated strictly.  Contributory infringement originates in tort and stems from the concept that one who is an active, immediate participant with another in causing an injury should also be held accountable.  It made its Supreme Court debut in a copyright case in 1911.  Harper Brothers adapted *Ben Hur* to film and sold it to jobbers who showed it in public.  Justice Holmes analogized that Harper went beyond the "indifferent supposition . . . that the buyer . . . is contemplating such unlawful use" and was actually an "accomplice in subsequent illegal use."  The Court held:

> The defendant not only expected but invoked by advertisement the use of its films for dramatic reproduction of the story.  That was the most conspicuous purpose for which they could be used, and the one for which especially they were made.  If the defendant did not contribute to the infringement it was impossible to do so except by taking part in the final act.  It is liable on principles recognized in every part of the law.

*Kalem Co. v. Harper Brothers*, 222 U.S. 55, 62-63 (1911).

This opinion needs context. At the time, moving pictures were novel, and the extension of the Copyright Act to them uncertain. Holmes contemplated this: "It is suggested that to extend the copyright to a case like this is to extend it to ideas as distinguished from the words in which those ideas are clothed." *Id.*, at 63. The dilemma posed by the creation of new media has been addressed by amendments to the Act. Holmes's solution, which was to inject common law contributory liability into copyright infringement, created a whole new class of infringers not specified in any version of the Act.

It did not take long for lower courts to extend contributory infringement too broadly. *See, e.g., Gross v. Van Dyk Gravure Co.*, 230 F, 412, 414 (2nd Cir. 1916) (finding a company that printed copies of an infringing photograph unknowingly liable for copyright owner's lost sales: "Why all who unite in an infringement are not, under the statute, liable for the damages we are unable to see.").

Today, courts require that to be a contributory infringer, Cole must (a) know of the vendors' infringement; and (b) induce, cause, or directly assist in its execution. *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159 (2nd Cir. 1971); *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001).

Sony wants to stretch these requirements to the point where they have become empty gestures. According to Sony's reasoning, Cole knew infringing activity had occurred and may continue to occur, and therefore Cole had knowledge of all infringements on his site at the time of sale. Without Cole's supply of facilities – booths, parking, food, bathrooms – the sales would not have occurred; thus, Cole could be said to have materially contributed.

Sony does not argue and cannot show that Cole aided or enhanced infringing sales specifically, in a manner distinct from Cole's facilitation of all sales at the flea market. Sony does not argue and cannot show that Cole was ever aware of a particular infringing seller at the time of the sale. Sony visited Cole and sent letters notifying him that vendors had been selling copied CDs and cassettes. None of the visits or letters identified current infringement; each was about past incidents with past vendors who may or may not return to the market.

The flea market has hundreds of vendors each weekend spread over 44 acres; approximately 1.5% sold music. Of these, an unknown number sold illegally-copied music. None of the vendors selling infringing music advertised that trade. Infringing music was offered for sale openly at first – openly, only in the sense that it was mixed with other goods, including re-sales of legally-produced music. The vendors apparently began hiding their illegal wares when they learned that they were being watched. In effect, the producers argue that the mere

existence of a flea market satisfies the causation requirement for infringing sales that Cole does not know are occurring. Cole is not akin to the driver of a get-away car; he is closer to the service station manager who sells the bank-robber gasoline.

Cole did not – under any rational interpretation – induce or cause the vendors to sell copied recordings. The vendors were acting of their own accord and for their own benefit. The only question is whether Cole contributed materially to their sales. Cole, through his flea market, is *at most* furnishing the physical location to accomplish an infringing activity. Cole is not responsible for all torts by vendors, whether it be assault, theft, or copyright infringement. One must contribute to the infringement to find liability, and not merely contribute to the existence of a place where people may misbehave. Sony will take nothing under contributory infringement.

5.     *Vicarious.*

Again, the Copyright Act imposes liability on direct infringers only. Starting in 1963, courts began to borrow the idea of vicarious liability from agency law and apply it to copyright enforcement. Agency law requires that Cole must have had (a) the right and ability to supervise, and (b) a direct financial interest in the infringement. *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 307 (2nd Cir. 1963).

A.     *Control.*

Vicarious liability was originally imposed only in a true agency – master-servant, principal-agent. The degree of supervision necessary for liability has since declined. Courts have extended liability to parties who are neither principals nor agents – as understood at law – contradicting the justification for imposing liability vicariously. *Shapiro*, 316 F.2d at 307. Courts now engage in their own determination of whether there is pervasive participation in the infringement. *Gershwin*, 443 F.2d at 1163.

Even with this looser standard, Cole's relationship with the vendors is too tenuous. He can not be described as an employer, master, principal, or even agent of them. The infringing vendors did not sell illegally with his consent, much less at his direction. Cole is not pervasively participating in the infringement. The infringement merely happened at his market.

Cole also does not control the infringers. Cole does have the right to supervise the vendors to promote his interest in generating revenue by having a safe and clean site, and Cole reserves this right in his agreement with the vendors. Cole reserves the ability, for example, to

dismiss vendors who try to sell firearms, illegal drugs, or hazardous substances – things that threaten his customers from enjoying his facility.   The extent of his supervision is the product of his own cost-benefit analysis – and not an indication that by excluding some activities, he is authorizing and encouraging others. It would be prohibitively expensive for Cole to employ enough security guards to supervise several hundred vendors on 44 acres, some small percentage of whom are covertly selling copied music.  To eliminate the risk of pirated music, Cole would have to screen every tape or cd at the market before opening for business. Detecting a pirated recording is much more difficult and time-consuming than spotting a fake Louis Vuitton handbag in a row of booths.  Cole is not obliged by his contractual right to inspect to examine every product for every intangible legal defect. The level of control is insufficient for a finding of vicarious liability.

B.    *Cole's Financial Interest.*

Sony claims that counterfeit music attracts buyers who would not otherwise shop at the flea market.  They have no evidence of this.  Each weekend, several hundred vendors sold merchandise; very few sold music, and even fewer sold infringing music.  It is unlikely that a few infringing vendors could draw many customers to their covert trade.  For example, Cole banned music sales except for a few permanent vendors on January 16, 2003.  His gross revenues from 2002 and 2003 remained stable.

By contrast, vicarious liability in *Fonovisa* was premised on the counterfeit recordings themselves serving as a draw for customers to the venue.  In *Fonovisa*, over 38,000 counterfeit recordings were seized in a single raid. *Fonovisa, Inc. v. Cherry Auction, Inc.*, 847 F. Supp. 1492, 1494 (E.D. Cal. 1994).  Only 2,200 counterfeit recordings were found at Cole's market.  Cole was not creating a marketplace for counterfeit recordings, and he did not receive a financial benefit from their presence as opposed to other legitimate wares. "Without the requirement that the counterfeit goods provide the main customer 'draw' to the venue, *Fonovisa* would provide essentially for the limitless expansion of vicarious liability into spheres wholly unintended by the court." *Adobe Systems, Inc. v. Canus Productions, Inc.*, 173 F. Supp. 2d 1044, 1051 (C.D. Cal. 2001).

To the extent that the vendors of infringing music did attract more shoppers, Sony argues that they benefitted Cole through fees for admission, food, and parking.  Traditionally, a landlord's benefit from infringement was direct when his revenue was based on the sale or use of infringing articles. *Shapiro*, 316 F.2d 304.

Cole did not receive a percentage of sales from the infringing vendors. If admission, food, and parking sales did increase, the numbers show that it was minor and imperceptible – and Cole's benefit was indirect. He also benefitted from selling licenses to vendors. Because so few vendors sold infringing music, and most of those that did also sold legitimate items, Cole's benefit is imperceptible. Sony will take nothing under vicarious liability.

6.     *Ratification and Indifference.*

Related to contributory and vicarious infringement is the concept of willful blindness. Sony warned Cole repeatedly, in person and by mail, of infringing sales. Cole knew that police had arrested some vendors for infringing sales, and he had been warned by Sony that at least one of those vendors had returned. Sony offered to train Cole at no cost – other than his time – how to better distinguish legitimate and infringing copies. Cole expressed no interest in what Sony had to say.

If Cole had been even minimally polite, perhaps this suit would never have been filed, and in hindsight, Cole would probably agree that the cost of the offered training was far less than that of litigation. His arguably bad choices are not, however, willful blindness.

A flea market owner does not have the duty to police his vendors, or enforce the producers' copyrights. Clearly, if Cole induced or caused a sale of infringing music, he would be liable. If Cole knew of a particular infringing sale – at the time of the sale – and chose to ignore it, he might be liable. His assertion that he didn't have time to do it and his refusal to consider alternatives does not mean Cole was willfully blind to the vendors' infringing activities. He was not indifferent. On the contrary, he cared very much about the extra work he would have to do to enforce Sony's copyrights.

The essential trade in the Copyright Act is monopoly and policing: the grant of exclusivity comes with the duty to protect it. The Act does not grant the holder the windfall of both monopoly and reimbursement for its maintenance.

Sony will take nothing on Cole's intransigence.

7.     *Conclusion.*

*Shapiro* and its progeny reveal the danger of misapplying unbounded common-law principles to a statutory scheme that needs neither supplementation nor gap-filling to protect intellectual property. The Copyright Act has existed since 1790, and never in its six iterations

has it mentioned vicarious or contributory liability.  One must be wary when a lone circuit court in 1963, with one fell swoop, creates a new category of copyright liability.

If vicarious and contributory liability are here to stay, each element must be addressed rigorously and exclusively.  The "right and ability to control" the infringer's act cannot be inferred from boilerplate contract language.  "Financial benefit" must stem from the infringing goods themselves, not from a flat rate received from infringers and non-infringers alike.  "Knowledge" must mean awareness of repeat infringing sellers, rather than past sellers who may never be seen again.  "Material contribution" must mean promoting and sustaining infringing activities, not merely providing a site on which some infringing activity may occur.  Gutting these elements of their meaning threatens many traditional American marketplaces by imposing impracticable requirements.  It also gives copyright holders a windfall by allowing them to manufacture liability with insufficient evidence.  At its core, this suit has nothing to do with copyright infringement.  It is an attempt to pass the cost of protecting one's copyright to middlemen and, ultimately, to consumers.

Sony is understandably concerned with the unauthorized sale and distribution of copyrighted music.  They are welcome to hire full-time investigators at Cole's flea market to increase enforcement of their copyrights.  What they may not do is hold Cole liable for illicit sales by third-party, unsupervised vendors – from whom he profits indirectly, if at all – simply because the sales occurred on his land.

Sony will take nothing from Cole.


Signed on March 31, 2010, at Houston, Texas.




                                        Lynn N. Hughes
                                United States District Judge